# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| DEBRA M. ADAMS, DANILLIE L. MARS, MICHELLE L. MILLER and ANITA W. DAME, individually on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Case No. 1:22-cv-00099-LM ) |
| DARTMOUTH-HITCHCOCK CLINIC, THE BOARD OF TRUSTEES OF DARTMOUTH-HITCHCOCK CLINIC, THE ADMINISTRATIVE INVESTMENT OVERSIGHT COMMITTEE OF DARTMOUTH-HITCHCOCK CLINIC and JOHN DOES 1-30. | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.  The Plans. ............................................................................................. 3

    B.  ERISA's fiduciary framework. ............................................................ 5

    C.  Plaintiffs' claims. ................................................................................ 7

ARGUMENT ..................................................................................................... 7

  I.  Plaintiffs Do Not Plead A Plausible Claim Based On Recordkeeping Expenses. .............. 8

    A.  Cherry-picked plans are not appropriate comparators. ..................... 9

    B.  Plaintiffs' fee estimates have no foundation. ................................... 11

    C.  The Fidelity plan is not an appropriate comparator. ....................... 14

    D.  Speculation about competitive bidding fails as a matter of law. ...... 15

  II.  Plaintiffs Do Not Plead A Plausible Claim Based On Investment Options. ..................... 16

    A.  Plaintiffs do not allege that they invested in the challenged options. ............ 16

    B.  Plaintiffs do not allege facts demonstrating an imprudent process. .............. 17

        1.  Plaintiffs' ICI comparisons fail as a matter of law. .................... 18

        2.  Plaintiffs' performance comparisons fail as a matter of law. ..................... 20

  III.  Plaintiffs Do Not Plead A Plausible Failure To Monitor Appointed Fiduciaries. ............. 23

    A.  Plaintiffs' monitoring claim is derivative. ....................................... 23

    B.  Plaintiffs plead no facts about the monitoring process. ................... 23

    C.  The monitoring claim against the Board is duplicative ................... 24

CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.*,
  2021 WL 3932029 (E.D. Wis. Sept. 2, 2021), *appeal filed*, No. 21-2789 (7th
  Cir. Oct. 1, 2021) ....................................................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................7, 8

*Barcenas v. Rush Univ. Med. Ctr.*,
  1:22-cv-366 (N.D. Ill. filed Jan. 21, 2022) ..............................................................1

*Barchock v. CVS Health Corp.*,
  886 F.3d 43 (1st Cir. 2018).............................................................................8, 9, 21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................7

*Brown v. Mitre Corp.*,
  No. 1:21-cv-11605 (D. Mass. Apr. 28, 2022) .........................................................17

*Bunch v. W.R. Grace & Co.*,
  532 F. Supp. 2d 283 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009)...............23

*Bunch v. W.R. Grace & Co.*,
  555 F.3d 1 (1st Cir. 2009)..........................................................................................6

*Carter v. San Pasqual Fiduciary Tr. Co.*,
  2016 WL 6803768 (C.D. Cal. Apr. 18, 2016) ........................................................23

*Chao v. Merino*,
  452 F.3d 174 (2d Cir. 2006).......................................................................................6

*Clark v. Beth Israel Deaconess Medical Center*,
  No. 1:22-cv-10068 (D. Mass. filed Jan. 18, 2022) ...................................................1

*Cunningham v. USI Services, LLC*,
  2022 WL 889164 (S.D.N.Y. Mar. 25, 2022) ..........................................................12

*Davis v. Wash. Univ. in St. Louis*,
  960 F.3d 478 (8th Cir. 2020) ..............................................................................20, 22

*Dorman v. Charles Schwab Corp.*,
  2019 WL 580785 (N.D. Cal. Feb. 8, 2019) .............................................................22

*Ellis v. Fidelity Mgmt. Trust. Co.*,
  883 F.3d 1 (1st Cir. 2018) ...........................................................................................5

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
  2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) ...........................................................4, 15, 21

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ....................................................................................................2

*Forman v. TriHealth, Inc.*,
  563 F. Supp. 3d 753 (S.D. Ohio 2021), *appeal filed*, No. 21-3977 (6th Cir.
  Oct. 25, 2021) ...........................................................................................................10

*Freeman v. City of Keene*,
  561 F. Supp. 3d 22 (D.N.H. 2021) .............................................................................16

*Garnick v. Wake Forest Univ. Baptist Med. Ctr.*,
  No. 1:21-cv-454 (M.D.N.C. filed June 4, 2021) ..........................................................1

*Harding v. Southcoast Hosp. Grp.*,
  No. 1:20-cv-12216 (D. Mass. filed Dec. 14, 2020) ......................................................1

*Holmes v. Baptist Health South Florida, Inc.*,
  No. 1:21-cv-22986 (S.D. Fla. filed Aug. 17, 2021) .....................................................1

*Hughes v. Nw. Univ.*,
  142 S. Ct. 737 (2022) ..................................................................................................6

*Isaacs v. Trustees of Dartmouth College*,
  2018 WL 2225097 (D.N.H. May 15, 2018) .................................................................15

*Johnson v. PNC Fin. Servs. Grp., Inc.*,
  2021 WL 3417843 (W.D. Pa. Aug. 3, 2021) ...............................................................15

*Kurtz v. Vail Corp.*,
  511 F. Supp. 3d 1185 (D. Colo. 2021) .........................................................................6

*Lange v. Infinity Healthcare Physicians, S.C.*,
  2021 WL 3022117 (W.D. Wis. July 16, 2021) ...........................................................17

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996) ....................................................................................................1

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................................16

*Martin v. Career Builder, LLC*,
  2020 WL 3578022 (N.D. Ill. July 1, 2020) ................................................................22

*Matney v. Barrick Gold of N. Am., Inc.*,
2022 WL 1186532 (D. Utah Apr. 21, 2022), *appeal filed*, No. 22-4045 (May
20, 2022) ...................................................................................................................10, 18

*Mator v. Wesco Distribution, Inc.*,
2022 WL 1046439 (W.D. Pa. Apr. 7, 2022)..................................................................10

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ......................................................................................9, 18, 22

*Moitoso v. FMR LLC*,
No. 1:18-cv-12122 (D. Mass.) ......................................................................................14, 15

*Monteiro v. The Children's Hospital Corp.*,
No. 1:22-cv-10069 (D. Mass. filed Jan. 18, 2022) ..................................................1

*In re Nokia ERISA Litig.*,
2011 WL 7310321 (S.D.N.Y. Sept. 6, 2011)................................................................23

*Norton v. Mass General Brigham Inc.*,
No. 1:22-cv-10045 (D. Mass. filed Jan. 13, 2022) ..................................................1

*Patterson v. Morgan Stanley*,
2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ......................................................17, 22

*Perkins v. United Surgical Partners Int'l, Inc.*,
2022 WL 824839 (N.D. Tex. Mar. 18, 2022) ..................................................10, 17, 18, 24

*Ruilova v. Yale-New Haven Hospital*,
No. 3:22-cv-111 (D. Conn. filed Jan. 21, 2022) ....................................................1

*Santiago v. Univ. of Miami*,
2021 WL 1173164 (S.D. Fla. Mar. 1, 2021)..............................................................17

*Seidner v. Kimberly-Clark Corp.*,
2022 WL 865890 (N.D. Tex. Mar. 23, 2022) ...........................................................10

*Smith v. CommonSpirit Health*,
2021 WL 4097052 (E.D. Ky. Sept. 8, 2021), *appeal filed*, No. 21-5964 (6th
Cir. Oct. 14, 2021) ...........................................................................................................4, 13

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.
Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)......................................................................................2, 21

*Struve v. Electrolux Home Prods., Inc.*,
2019 WL 918503 (N.D. Ill. Feb. 25, 2019) .............................................................23

*Tobias v. NVIDIA Corp.*,
  2021 WL 4148706 (N.D. Cal. Sept. 13, 2021) ...............................................10, 18

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .................................................................................16

*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993) ................................................................................5

*Wehner v. Genentech, Inc.*,
  2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ...............................................14, 22

*White v. Chevron Corp.*,
  2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ............................................15, 22

*White v. Chevron Corp.*,
  2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th
  Cir. 2018) ...................................................................................11, 12, 13

*Wilcox v. Georgetown Univ.*,
  2019 WL 132281 (D.D.C. Jan. 8, 2019)...........................................9, 11, 17

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
  325 F. App'x 31 (2d Cir. 2009) ........................................................................10

**Statutes**

29 U.S.C. § 1104(a)(1)......................................................................................5

**Other Authorities**

29 C.F.R. § 2509.75–8 ....................................................................................23

29 C.F.R. § 2550.404a-5 ...................................................................................4

Capital Group, American Funds Growth and Income Portfolio SM (RGNGX),
  https://www.capitalgroup.com/individual/investments/fund/rgngx (last visited
  May 31, 2022)...........................................................................................21

Daniel Aronowitz, Euclid Fiduciary, *Debunking Recordkeeping Fee Theories in
  "Excessive" Fee Cases* (Apr. 2022), *available at*
  https://www.euclidspecialty.com/wp-content/uploads/2022/04/Euclid-
  Fiduciary-Whitepaper-Debunking-Recordkeeping-Fee-Theories-April-2022-
  Rev-Ed.pdf ...............................................................................................15

Ex. 15, *BrightScope/ICI Defined Contribution Plan Profile: A Close Look at
  401(k) Plans* (2017), *available at* https://www.ici.org/doc-
  server/pdf%3A20_ppr_dcplan_profile_401k.pdf ......................................18, 19, 20

U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* (Aug. 2013),
    https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-
    activities/resource-center/publications/a-look-at-401k-plan-fees.pdf ...................................18

U.S. Dep't of Labor, *Tips for Selecting and Monitoring Service Providers for
    Your Employee Benefit Plan*,
    https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-
    activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-
    service-providers.pdf ............................................................................................................6

U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses* 23-
    (Sept. 2021), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-
    activities/resource-center/publications/understanding-retirement-plan-fees-
    and-expenses.pdf............................................................................................................4, 6

Vanguard Group, *Best Practices for Plan Fiduciaries* 36 (2019),
    https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=fals
    e..........................................................................................................................................6

# INTRODUCTION

Dartmouth-Hitchcock Clinic ("Dartmouth-Hitchcock") is a leading provider of primary and specialty care to northern New England, serving nearly two million patients in almost every area of medicine. Compl. ¶ 23. Because employee health and well-being are vital to the organization, Dartmouth-Hitchcock provides its employees with a range of competitive benefits, including insurance, discount programs, and health care and retirement benefits. Among other things, eligible employees can contribute to two participant-directed retirement plans (the "Plans") that provide a diverse range of investment options to save for retirement.

Retirement plans are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), but "nothing in ERISA . . . mandate[s] what kind of benefits employers must provide if they choose to have such a plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Unfortunately, in recent years, a small faction of the plaintiffs' bar has ignored this fundamental principle, filing scores of lawsuits against plan fiduciaries for doing nothing more than selecting different investment options or plan services than the ones that the plaintiffs claim, in hindsight, they would prefer. Capozzi Adler, the law firm representing Plaintiffs in this case, has filed roughly 40 such lawsuits since 2021, all relying on cookie-cutter allegations and apples-to-oranges comparisons in the hopes of surviving a motion to dismiss. These cases have included a tidal wave of litigation against hospitals and healthcare providers like Dartmouth-Hitchcock.[1]

---

[1]     Among the other recent cases filed by Capozzi Adler against health care providers are *Ruilova v. Yale-New Haven Hospital*, No. 3:22-cv-111 (D. Conn. filed Jan. 21, 2022); *Barcenas v. Rush Univ. Med. Ctr.*, 1:22-cv-366 (N.D. Ill. filed Jan. 21, 2022); *Monteiro v. The Children's Hospital Corp.*, No. 1:22-cv-10069 (D. Mass. filed Jan. 18, 2022); *Clark v. Beth Israel Deaconess Medical Center*, No. 1:22-cv-10068 (D. Mass. filed Jan. 18, 2022); *Norton v. Mass General Brigham Inc.*, No. 1:22-cv-10045 (D. Mass. filed Jan. 13, 2022); *Holmes v. Baptist Health South Florida, Inc.*, No. 1:21-cv-22986 (S.D. Fla. filed Aug. 17, 2021); *Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, No. 1:21-cv-454 (M.D.N.C. filed June 4, 2021); and *Harding v. Southcoast Hosp. Grp.*, No. 1:20-cv-12216 (D. Mass. filed Dec. 14, 2020).

The goal of these tactics is plain. "[T]he prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests." *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc*., 712 F.3d 705, 719 (2d Cir. 2013). Coupled with the inevitable motion for class certification, this makes ERISA susceptible to what courts have called "settlement extortion," whereby a plaintiff "with a largely groundless claim" will "simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence." *Id*. For this reason, the Supreme Court has called motions to dismiss an "important mechanism" for weeding out meritless suits, emphasizing that "careful, context-sensitive scrutiny" is needed to decide "whether the complaint states a claim that the defendant has acted imprudently." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

As one might expect, given its cut-and-paste nature, the complaint in this case does not meet this standard. Indeed, the complaint alleges virtually nothing specific about the Plans' services or investments at all. Plan participants regularly receive annual disclosures, as well as quarterly account statements, that set forth details about investments and the specific recordkeeping and administrative expenses being charged. Plaintiffs entirely ignore these disclosures. Instead, Plaintiffs offer a host of flawed and incomplete calculations, supposedly based on generic industry publications and disparate filings by other plans, none of which allow the Court to meaningfully assess the Plans' services and investments in context.

For these reasons, numerous courts have rejected identical assertions by Plaintiffs' counsel in other cases, holding that their allegations fail to raise any inference that the Plans' fiduciaries made imprudent decisions. *See, e.g.*, *infra* pp. 10-15, 18-20. ERISA does not require fiduciaries to

select the cheapest options, and a plaintiff alleging imprudence based on a plan's services or investments cannot merely identify different options that purportedly cost less. Because Plaintiffs allege nothing to make it plausible that Defendants breached their fiduciary duties, the Court should dismiss Plaintiffs' complaint.

## BACKGROUND

### A.    The Plans.

Dartmouth-Hitchcock sponsors two defined contribution retirement plans, the Dartmouth-Hitchcock Retirement Plan and the Dartmouth-Hitchcock Employee Investment Plan; each gives eligible employees the opportunity to make tax-advantaged contributions to save for retirement. Compl. ¶¶ 42-43.[2] Participants in the Plans make periodic contributions from their paychecks, which are placed into an individual account. *Id*. ¶¶ 44-45. Dartmouth-Hitchcock matches a portion of these contributions to encourage participation and to bolster employees' retirement savings. *Id*. Each participant chooses how to invest the assets in their individual account from a menu of diversified investment options; benefits are based on the value of that account, including contributions and any investment income, expenses, and gains or losses. *Id*. ¶ 42.

Dartmouth-Hitchcock delegates day-to-day administrative responsibility for the Plans to the Administrative Investment Oversight Committee ("Committee"), which is responsible for selecting and monitoring the investment options and service providers and ensuring that they are reasonable and appropriate for the Plans. Compl. ¶ 27. As of 2020, Plaintiffs allege that the combined Plans had roughly $2 billion in assets and 30,000 participants, *id*. ¶¶ 52, 86, although this estimate double-counts employees who participate in both Plans.

---

[2]     The complaint refers to the Dartmouth-Hitchcock Retirement Plan and the Dartmouth-Hitchcock Employee Investment Plan as the "401(a) Plan" and the "403(b) Plan," respectively, referring to the section of the Internal Revenue Code under which the plans are operated.

***Recordkeeping***. T. Rowe Price served as the Plans' recordkeeper during the relevant time period. Compl. ¶ 86. Recordkeepers offer many services to plans, like maintaining account records, processing transactions, communicating with and educating participants, consulting about plan lineups, and more. *Id*. ¶ 71. Recordkeepers also offer what Plaintiffs call "a la carte" services, such as loan processing or account maintenance, which individual participants select as needed. *Id*. ¶ 73.

Administrative services have costs, which vary depending on the services provided. As Plaintiffs concede, ERISA does not require any particular structure for administrative fees. Compl. ¶¶ 75-77. Some plans collect administrative fees by deducting expenses directly from participants' individual accounts; others share a portion of the plan's investment fees with the recordkeeper (so-called "revenue sharing"). *Id*. Still others use a combination of these methods. *Id*. In addition, plan sponsors may subsidize some or all administrative costs, although they are not required to do so.[3]

In accordance with 29 C.F.R. § 2550.404a-5, participants receive annual fee disclosures of the fees and expenses charged to participants. Participants also receive quarterly account statements that show, among other things, fees deducted directly from their account to pay administrative expenses. At the start of the putative class period, Dartmouth-Hitchcock paid a portion of administrative expenses and other expenses from plan assets. *E.g.*, Ex. 1, 404a-5 Disclosure (2016), at 2. Later, participants directly paid a $8.75 service fee and a $1.75 administrative fee each quarter ($10.50 total), equivalent to an annual fee of $42 per participant per Plan. *E.g.*, Ex. 6, 404a-5 Disclosure (2020), at 2.[4] These fees were also reflected on the front page of quarterly statements received by each participant, including Plaintiffs.

---

[3]     *See generally* U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses* 2-3 (Sept. 2021),  https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/ understanding-retirement-plan-fees-and-expenses.pdf.

[4]     Courts routinely take judicial notice of annual fee disclosures in connection with motions to dismiss. *E.g.*, *Smith v. CommonSpirit Health*, 2021 WL 4097052, at *9 n.2 (E.D. Ky. Sept. 8, 2021), *appeal filed*, No. 21-5964 (6th Cir. Oct. 14, 2021); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714,

*Investment options*. Participants can invest their savings in various vehicles to grow their assets, offset inflation, and achieve other goals. To ensure that participants can create portfolios that fit their individual circumstances, the Dartmouth-Hitchcock Plans offer a diversified menu of investment options. Compl. ¶ 51. The core of the menus are target date funds that provide a one-stop option based on a participant's anticipated retirement date. The Plans also offer a variety of stock and bond funds for participants who hope to outperform the market or diversify their savings, and a stable value fund for capital preservation. *See*, *e.g.*, Ex. 1, 404a-5 Disclosure (2016), at 3-8. In late 2017, the Plans rolled out a streamlined investment lineup. The new lineup offered a different target date fund provider, a revised set of low-cost passively managed equity and fixed income options, and actively managed funds in a variety of asset classes. *See* Ex. 3, 404a-5 Disclosure (2017 Addendum), at 1-2; Ex. 4, 404a-5 Disclosure (2018), at 3-6.

### B.    ERISA's fiduciary framework.

Under ERISA, every plan must be administered by one or more fiduciaries, who are required to act with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). ERISA thus imposes a relative standard of care that looks to the practices of a fiduciary's peers under like circumstances. The duty of prudence "is one of conduct, and not a test of the result" of the investment or service. *Ellis v. Fidelity Mgmt. Trust. Co.*, 883 F.3d 1, 10 (1st Cir. 2018).[5]

---

at *3 n.4 (S.D.N.Y. Sept. 18, 2019); *see also Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (court may consider documents central to the plaintiff's claims or whose authenticity is not disputed by the parties). Defendants submit only the 403(b) Plan disclosures because the 401(a) Plan disclosures are materially similar. If the Court wishes to review the 401(a) Plan disclosures, Defendants will submit them as well.

[5]      ERISA also imposes a duty of loyalty, requiring fiduciaries to act in the best interests of participants; a duty to diversify investments; and a duty to act in accordance with plan documents. 29 U.S.C. § 1104(a)(1)(A), (C), (D). These duties are not at issue here.

Fiduciaries must consider a variety of factors when making decisions, so "the circumstances facing an ERISA fiduciary" will often "implicate difficult tradeoffs," and the Supreme Court has instructed that courts "must give due regard to the range of reasonable judgments a fiduciary may make." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022); *see also Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (ERISA does not require a fiduciary to take "any particular course of action if another approach seems preferable"). Put another way, fiduciary decisions "involve[] a balancing of competing interests under conditions of uncertainty" and fiduciaries must consider the "totality of the circumstances" rather than any one factor. *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 3 (1st Cir. 2009).

As the Department of Labor recognizes, fees and expenses are just "one of several factors" for fiduciaries to consider and "plan fiduciaries are not always required to pick the least costly provider."[6] Another source cited in the complaint concurs, stating that "[w]hile it is natural to focus on costs, ERISA does not require a plan sponsor to select the lowest-cost provider or investment option. Other factors, such as service levels, reputation of the provider, and investment performance, may be considered when determining if fees are reasonable."[7] In short, while Plaintiffs are correct that fiduciaries should consider the cost of investment options, Compl. ¶ 4, "there are other factors for which a fiduciary—and a participant—might want to optimize besides cost." *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1198 (D. Colo. 2021).

---

[6]    U.S. Dep't of Labor, *supra* n.3; U.S. Dep't of Labor, *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan* 1, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf.

[7]    The Vanguard Group, *Best Practices for Plan Fiduciaries* 36 (2019), https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false (cited at Compl. ¶ 63).

### C.      Plaintiffs' claims.

Plaintiffs Debra Adams, Danillie Mars, Michelle Miller, and Anita Dame are former Dartmouth-Hitchcock employees and participants in the Plans. Compl. ¶¶ 17-20. Plaintiffs allege that the Plans' investment management and recordkeeping and administrative fees were too high compared to a small number of other plans, *id*. ¶¶ 64, 79, and criticize a "handful" of the Plan's investment options, concluding that their supposedly high fees show that the Committee "breached [its] fiduciary duties" to the Plans in "multiple respects." *Id*. ¶ 107. However, Plaintiffs do not allege what investments they selected in their retirement accounts, and they admit that recordkeeping and administrative fees are the "crux" of their lawsuit. *Id*. ¶ 68.

The complaint contains two claims for relief, brought on behalf of a putative class of participants and beneficiaries from March 18, 2016 to the present. Compl. ¶ 35. The first claim, against the Committee only, alleges that the Committee breached its duty of prudence by "saddling the Plans and its participants with excessive Plan recordkeeping and administration costs and excessive expense ratios."[8] *Id*. ¶ 108. The second claim, against Dartmouth-Hitchcock and the Board, alleges that these Defendants did not monitor the Committee adequately and thus are liable for the Committee's purported breaches. *Id*. ¶ 116.

### ARGUMENT

To survive a motion to dismiss, a complaint must allege a "plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although

---

[8]      An "expense ratio" is a number, usually expressed in basis points (one-hundredth of one percent), that reflects the annual investment management fees charged to investors as a percentage of their investment. Compl. ¶ 61.

a court must take the well-pled factual allegations in a plaintiff's pleadings as true, and make all reasonable inferences in favor of the plaintiff, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 545. Determining whether a complaint meets this standard is "necessarily . . . context specific," *Barchock v. CVS Health Corp.*, 886 F.3d 43, 44 (1st Cir. 2018), requiring a court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. As shown below, all of Plaintiffs' claims fail this threshold standard.

## I.    Plaintiffs Do Not Plead A Plausible Claim Based On Recordkeeping Expenses.

Plaintiffs allege that the Committee failed to prudently monitor recordkeeping and administrative expenses during the class period, causing the Plans to pay "excessive" fees for administrative services. Compl. ¶¶ 69-92. But although the duty of prudence focuses on the process leading up to a challenged decision, Plaintiffs allege nothing about the process the Committee followed to monitor recordkeeping and administrative costs. Instead, Plaintiffs offer a chart that they claim reflects the Plans' administrative and recordkeeping fees from 2016 to 2020, and then use a different, unexplained methodology to derive the administrative fees five other plans allegedly paid in 2019. *Id*. ¶¶ 82, 90. Plaintiffs conclude that these five plans paid less in administrative fees, supposedly, than the Plans.

Based on this guesswork, Plaintiffs ask the Court to infer that the Dartmouth-Hitchcock Plans "could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost, specially [sic], in the range of $14 to $35." Compl. ¶ 92. For several reasons, Plaintiffs' exercise does not make it plausible that the Committee acted imprudently with respect to the Plan's administrative services.

### A.      Cherry-picked plans are not appropriate comparators.

Plaintiffs' recordkeeping claim is based principally on allegations that the Plan paid higher recordkeeping fees, as measured on a per participant basis, than five "other plans of a similar size in 2019." Compl. ¶ 90. This type of comparison proves nothing.

For one thing, there are tens of thousands of retirement plans; ERISA does not impose liability simply because plaintiffs claim to have found a handful of plans that pay less for services than others. Indeed, the First Circuit has held that alleging a mere deviation from industry averages is insufficient to state a claim. *See Barchock*, 886 F.23d at 52-53 (concluding that "survey statistics" that purport to show that a defendant charted a different course than most other fiduciaries do not "support a plausible claim that such decision-making was imprudent").

For another, although Plaintiffs assert that the five plans they identify in the complaint are "comparable," the allegations of the complaint show that there are significant differences. All of the plans are corporate 401(k) plans and none are 401(a) or 403(b) plans like the Plans. *Cf. Wilcox v. Georgetown Univ.,* 2019 WL 132281, at *8 (D.D.C. Jan. 8, 2019) (holding that ERISA does not require fiduciaries to run 403(b) plans like 401(k) plans or vice versa). The cited plans use four different recordkeepers and purportedly pay them a range of different fees, but none use T. Rowe Price like the Plans. Finally, nearly all of the plans have significantly more assets than the Plans. Compl. ¶ 90. Plaintiffs do not allege any facts demonstrating that these differently situated plans are a "sound basis for comparison" to the Plans at issue here. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018).

Plaintiffs' comparison of five cherry-picked alternatives is particularly deficient because the complaint fails to plead any facts about what services those plans received. Plaintiffs merely plead facts about administrative services that recordkeepers offer to the market in general. Compl. ¶¶ 71-74 (alleging that "typical[]" "bundled" and "a la carte" offerings include, but are not limited

to, certain services). Plaintiffs make no attempt to link those generic allegations to the services that *these* plans, or the Dartmouth-Hitchcock Plans, contracted for in particular.

A plaintiff who "fail[s] to allege that the fees were excessive relative to the services rendered" fails to state a claim. *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009). Accordingly, courts routinely dismiss excessive fee claims where a plaintiff does not plausibly allege that so-called comparator plans contracted for similar fees and services. In one recent case brought by Plaintiffs' counsel, for example, the court dismissed a recordkeeping claim because the plaintiffs "failed to plead sufficient factual allegations about the Plan's offered services and fee structures for the Court to infer more than a possibility of misconduct." *Perkins v. United Surgical Partners Int'l, Inc.*, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022). In another, the court dismissed the claim where the plaintiffs "fail[ed] to provide any allegations regarding the specific services actually provided to the Plan" and "only provide[d] general statistics regarding the fees paid by plans of similar sizes." *Tobias v. NVIDIA Corp.*, 2021 WL 4148706, at *15 (N.D. Cal. Sept. 13, 2021). Many other courts agree that "a mere price tag to price tag comparison" is insufficient where, as here, the complaint does not "address the types or levels of services that any plan contracted to receive." *Mator v. Wesco Distribution, Inc.*, 2022 WL 1046439, at *6-7 (W.D. Pa. Apr. 7, 2022).[9] For this reason alone, Plaintiffs' claim should be dismissed.

---

[9]      *See also, e.g.*, *Matney v. Barrick Gold of N. Am., Inc.*, 2022 WL 1186532, at *12 (D. Utah Apr. 21, 2022) (reliance on alleged recordkeeping fee "averages" is "too far removed to create anything more than the 'mere possibility' of misconduct"), *appeal filed*, No. 22-4045 (May 20, 2022); *Seidner v. Kimberly-Clark Corp.*, 2022 WL 865890, at *2 (N.D. Tex. Mar. 23, 2022) (claims were "not sufficiently pleaded for purposes of Rule 12(b)(6)"); *Forman v. TriHealth, Inc.*, 563 F. Supp. 3d 753, 761-62 (S.D. Ohio 2021), *appeal filed*, No. 21-3977 (6th Cir. Oct. 25, 2021) ("While the size and structure of the plans are relevant" to assessing prudent fees, "similarly relevant is the types and scope of the services offered in exchange for those administrative fees and whether those services are sufficiently similar such that the higher administrative fee amount is unjustified."); *Albert v. Oshkosh Corp.*, 2021 WL 3932029, at *5 (E.D. Wis. Sept. 2, 2021), *appeal filed*, No. 21-2789 (7th Cir. Oct. 1, 2021) (complaint did not "allege any facts as to what would constitute a reasonable fee or any facts suggesting that the fee charged by Fidelity is excessive in relation to the services provided").

Plaintiffs also rely on "authorities" that purportedly show some plans paying $35 per participant for administrative services in 2016. Compl. ¶ 91 & n.11. But these vague allegations suffer from the same fundamental flaw. Plaintiffs do not allege any facts about these plans that plausibly suggest they are comparable to the Plans at issue here. Nor do Plaintiffs explain what services these plans received from their recordkeepers or how those services compare to the services provided to the Plans. As one court put it, the "mere allegation" that a defendant, who paid more than $35 per participant for recordkeeping, "could continue to offer the same Plans and the same associated services for $35/year has no factual support, is entirely speculative, contrary to case law and common sense, and does not warrant discovery." *Wilcox*, 2019 WL 132281, at *13.

**B.      Plaintiffs' fee estimates have no foundation.**

Even if a mere price-tag-to-price-tag comparison sufficed to raise a plausible inference of imprudence—and it does not—Plaintiffs' price-tag estimates are entirely unfounded. Courts routinely dismiss recordkeeping claims where it is clear that the plaintiffs have merely "guess[ed]" at the administrative fees paid. *White v. Chevron Corp.*, 2017 WL 2352137, at *18 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018).

First and foremost, Plaintiffs do not explain how they calculate the Plans' supposed "per participant administrative and recordkeeping fees." Compl. ¶ 82. As discussed above, Plaintiffs know what administrative fees they have been charged individually, because those amounts are specifically identified in their quarterly statements and referenced in recent annual disclosures. *See supra* p. 4. Indeed, Plaintiffs allege that they reviewed their "plan participant statements" in preparing their complaint. Compl. ¶ 36. Nonetheless, Plaintiffs do not attach or reference this information.

Plaintiffs instead offer a chart purporting to show compensation paid to T. Rowe Price. Compl. ¶ 82. Their "RK Direct" figure appears to be taken from the direct payments reported on

Schedule C of the Plans' Form 5500, an annual form that plan administrators file with the Department of Labor.[10] But Plaintiffs add an "RK Indirect" number to this figure, even though the indirect compensation data does not appear on the Form 5500 and Plaintiffs do not explain where they obtained it. Compl. ¶ 82. In *Cunningham v. USI Services, LLC*, the court dismissed a recordkeeping claim because the plaintiff "fail[ed] to specify how she calculated the Plan's indirect fees," which were "not available by themselves on the Form 5500 filings," and "nowhere in the Complaint d[id] Plaintiff provide any figures, estimates, or formulas from which the Court could reasonably infer Plaintiff obtained such results." 2022 WL 889164, at *5 (S.D.N.Y. Mar. 25, 2022). Plaintiffs' complaint suffers from the very same shortcoming.[11]

Plaintiffs' comparators suffer from similar problems. Plaintiffs claim that they base their expense calculations for these plans on Form 5500 reports. Compl. ¶ 90 n.9. But the Form 5500s indicate that almost all of these plans also paid their recordkeepers using indirect compensation,[12]

---

[10]     *See, e.g.*, Ex. 7, 403(b) Plan Form 5500 (2016), Sch. C at p. 3-1; Ex. 11, 403(b) Plan Form 5500 (2020), Sch. C at p. 3-1. As before, the Form 5500s for the 401(a) Plan and 403(b) Plan are materially similar, so Defendants are not submitting all of the 401(a) Plan forms. Similar to annual fee disclosures, *see supra* n. 4, courts routinely take judicial notice of Form 5500s, *see, e.g.*, *White*, 2017 WL 2352137, at *5, and Plaintiffs expressly cite the Form 5500s as a basis for their allegations. Compl. ¶¶ 23, 36, 90.

[11]     As the instructions to the Form 5500 explain, plans must report all "direct compensation" to service providers (including recordkeepers), but do not have to report the amount of all "indirect compensation" paid from sources other than the plan. Ex. 14, Form 5500 Instructions (2019), at 24-25. Specifically, the instructions permit plans to exclude the amount of so-called "eligible" indirect compensation. *Id.* at 24-26.

        Also unexplained, Plaintiffs subtract a $216,962 credit from the recordkeeping expenses reported by the 401(a) Plan for 2018. Compl. ¶ 81. This appears to reflect payments from an administrative account the Plans used to pay indirect compensation for a variety of administrative services. *See* Ex. 12, 401(a) Plan Form 5500 (2018), Auditor Rpt. at 7 ("The Plan holds assets in an Administrative Budget Account which receives revenue as a result of a revenue sharing agreement with T. Rowe Price. . . . Funds in the account are used to pay qualified plan expenses including record-keeping fees, auditing and accounting fees, and investment advice fees. During 2018, $1,083,258 were used to pay plan expenses and $216,962 were allocated to participants."). Plaintiffs do not indicate why they ignore the other payments from this account when calculating supposed administrative expenses.

[12]     *See generally* Ex. 13 (2019 Schedule Cs for the Deseret, Dow, WPP, Danaher, and Rite-Aid Plans). Item 2(e) and (f) of Schedule C indicates whether the plans paid indirect and eligible indirect compensation.

and Plaintiffs do not even purport to include that indirect compensation in their comparator calculations. This not only shows that Plaintiffs are using inconsistent approaches to calculating plan expenses. It also prevents the Court from drawing meaningful comparisons between these figures. *See Smith*, 2021 WL 4097052, at *11 (dismissing claim because the Form 5500 indicated the payment of indirect compensation through revenue sharing, but the complaint failed to provide the details necessary to assess the "total recordkeeping fees and how that amount stacks up against" other plans' costs).

Finally, the Form 5500s suggest that each of the plans in the complaint received a *different* mix of services. Each Form 5500 includes "service codes" that indicate the services the plan received. None are the same as the service codes on the Plan's Form 5500.

| Service Codes Reported for Recordkeeper on Form 5500s (2019) [13] | | | | | |
|---|---|---|---|---|---|
| Dartmouth-Hitchcock | Deseret | Dow Chemical Co. | WPP Group | Danaher Corp. | Rite Aid |
| 15, 49, 57 | 64 | 37, 50, 60, 64, 65 | 15, 16, 25, 37, 52, 99 | 37, 64, 65, 71 | 15, 50 |

This is the definition of comparing apples to oranges, and further demonstrates that Plaintiffs' expense comparisons are entirely unfounded. *See White*, 2017 WL 2352137, at *18 ("the source of [the plaintiff's] per-participant estimate includes a number of other fees paid to Vanguard that are unrelated to recordkeeping," and plaintiffs "do not know what portion of the total fees actually relate to recordkeeping"). In short, there are too many data gaps and overt differences between the various plans to draw meaningful inferences about the process the Committee followed to monitor the Plans' administrative fees.

---

[13]     *See generally* Ex. 13 (2019 Schedule Cs for the Deseret, Dow, WPP, Danaher, and Rite-Aid Plans). Item 2(b) contains the applicable service codes. The Form 5500 instructions provide the meaning of each service code. *See* Ex. 14, Form 5500 Instructions, at 27.

### C.      The Fidelity plan is not an appropriate comparator.

In addition to their Form 5500 allegations, Plaintiffs rely upon a retirement plan Fidelity offered to its own employees to demonstrate that prudent fiduciaries would have paid no more than $14 to $21 per participant in administrative fees during the putative class period. Compl. ¶ 87. Plaintiffs do not use the Form 5500 for the Fidelity plan to derive this estimate. Instead, Plaintiffs rely on a stipulation in *Moitoso v. FMR LLC*, No. 1:18-cv-12122 (D. Mass.), where Fidelity stated that services it provided to its own retirement plan had a market value of $14 to $21. *Id.* ¶ 88.

Again, Plaintiffs allege no basis for comparing Fidelity's plan to the Plans at issue here. Fidelity's plan had 58,000 participants, several times larger than the Dartmouth-Hitchcock Plans. Compl. ¶¶ 86-87; *see also id.* ¶ 75 (alleging that plans with more participants enjoy lower per-participant recordkeeping fees). In addition, the stipulation does not indicate what administrative services Fidelity provided to its plan. That Fidelity's plan supposedly did not "receive any broader or more valuable services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets" (*id.* ¶ 88) is irrelevant, because the Plans here were not recordkept by Fidelity. Plaintiffs also do not address whether the services Fidelity provided to its plan may have been narrower—and therefore less costly—than the services T. Rowe Price provided to the Plans.

Unsurprisingly, multiple courts have rejected Plaintiffs' counsel's reliance on the *Moitoso* stipulation as a means for pleading imprudence. Over a year ago, one court held that "the $14–21 figure cannot serve as an adequate market comparator" because, as here, the plaintiff "does not explain how the services that Fidelity provided to its own plans are equivalent in value to the services Fidelity provided to the Plan at issue in this case." *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021). Another court rejected "the asserted $14 to $21 average recordkeeping fee" because it is "premised on unspecified recordkeeping services provided by

-14-

Fidelity . . . without any comparison to the services provided to the Plan." *Johnson v. PNC Fin. Servs. Grp., Inc.*, 2021 WL 3417843, at *4 (W.D. Pa. Aug. 3, 2021). Plaintiffs here simply assert the same flawed allegations, even as none of the other comparators in the complaint allegedly paid anywhere near $14 per participant in 2019. Compl. ¶ 90.[14]

### D. Speculation about competitive bidding fails as a matter of law.

Plaintiffs speculate that because the Plans supposedly paid more for recordkeeping than other plans, "there is little to suggest that Defendants conducted an appropriate [request for proposal] at reasonable intervals." Compl. ¶¶ 80-81. But Plaintiffs have no basis for this assertion. They concede they have no idea whether the Plans conducted a request for proposal during the relevant time period. *See id.* ¶ 56 ("Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan.").

Speculation that Defendants did not conduct an RFP is not a well-pled fact that this Court must credit on a motion to dismiss. *See Isaacs v. Trustees of Dartmouth College*, 2018 WL 2225097, at *3 (D.N.H. May 15, 2018) (explaining that "well-pleaded facts must be 'non-conclusory' and 'non-speculative'" and that "Plaintiff's incredulity is no substitute for an adequate factual allegation"). However, even assuming that the speculation about RFPs were accurate, ERISA does not compel plan fiduciaries to solicit quotes or competitive bids at any particular interval to satisfy their fiduciary obligations.[15] Therefore, alone or in combination with the complaint's other allegations, Plaintiffs' RFP allegations do not suffice to state a claim.

---

[14]     Courts are not alone in recognizing that the *Moitoso* stipulation is insufficient. An insurer has noted that if the allegations about the stipulation are correct, then "nearly every large plan in America can be sued," because "nearly every plan in America has recordkeeping fees above $14-21." Daniel Aronowitz, Euclid Fiduciary, *Debunking Recordkeeping Fee Theories in "Excessive" Fee Cases* at 11 (Apr. 2022), *available at* https://www.euclidspecialty.com/wp-content/uploads/2022/04/Euclid-Fiduciary-Whitepaper-Debunking-Recordkeeping-Fee-Theories-April-2022-Rev-Ed.pdf.

[15]     *See, e.g.*, *Ferguson*, 2019 WL 4466714, at *8 ("ERISA does not require plan fiduciaries to obtain competitive bids from plan service providers."); *White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D.

## II.        Plaintiffs Do Not Plead A Plausible Claim Based On Investment Options.

In addition to challenging recordkeeping expenses, Plaintiffs challenge a small number of the Plans' investment options on the grounds that they cost too much or did not perform as well as other options. Plaintiffs lack standing to bring this claim, and regardless, it fails on the merits.

### A.        Plaintiffs do not allege that they invested in the challenged options.

For there to be a case or controversy under Article III, a plaintiff must have "a 'personal stake' in the case." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). This means that the plaintiff must allege that the challenged conduct—here, the decision to offer certain investments as options in the Plan's investment menu—caused a concrete and particularized injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). If a plaintiff does not do so, the court lacks subject matter jurisdiction, and the claim should be dismissed under Rule 12(b)(1). *Freeman v. City of Keene*, 561 F. Supp. 3d 22, 25-26 (D.N.H. 2021) (citing *Muniz-Rivera v. United States*, 326 F.3d 8, 11 (1st Cir. 2003)).

Plaintiffs allege that they have standing because they "participated in the Plans and were injured by Defendants' unlawful conduct." Compl. ¶ 21. But although each Plaintiff alleges that they "participated in the Plan investing in the options offered by the Plan and the subject of this complaint," *id*. ¶¶ 17-20, no Plaintiff alleges that they invested in any of the specific funds that the complaint claims were imprudent. If no Plaintiff selected the challenged investments, the decision to offer those investments to participants could not have caused any Plaintiff a concrete injury necessary to create standing.

---

Cal. Aug. 29, 2016) ("the allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation").

This follows from the nature of a defined contribution plan. As explained above, a participant in a defined contribution plan is entitled only to the value in their *individual* account, reflecting the investment gains, losses, and expenses associated with the particular funds in which they have invested. Expenses and any investment gains or losses associated with funds in which a plaintiff did *not* invest do not impact his or her benefits. Accordingly, "by failing to allege injury to their own investment accounts or their investment in any of the challenged funds, the plaintiffs have alleged an injury to the Plan and participants generally, but not to the individual plaintiffs themselves." *Perkins*, 2022 WL 824839, at *4.[16] Plaintiffs' failure to allege injury based on their own investments similarly dooms their claim. *Cf.* Order, Dkt. 32, *Brown v. Mitre Corp.*, No. 1:21-cv-11605 (D. Mass. Apr. 28, 2022) (granting motion to dismiss a recordkeeping claim on standing grounds where the named plaintiff did not invest in funds that paid revenue sharing, which the plaintiff claimed had resulted in excessive administrative expenses).

### B.    Plaintiffs do not allege facts demonstrating an imprudent process.

Even if Plaintiffs had standing to challenge funds in which they do not allege they ever invested, the complaint fails to state a plausible claim of imprudent process with regard to those funds (or any others). As with the recordkeeping claim, Plaintiffs allege no specific defects in the process that the Committee followed to select and monitor the Plans' investment lineup. Compl. ¶ 56. Instead, Plaintiffs offer circumstantial allegations that courts have repeatedly rejected, holding that they do not raise a plausible inference at the pleading stage.

---

[16]    *See also, e.g.*, *Santiago v. Univ. of Miami*, 2021 WL 1173164, at *7 (S.D. Fla. Mar. 1, 2021) ("Beyond the bare assertion that Plan participants were harmed by the offering of underperforming investments, the Complaint does not explain how the offering of two funds in which they did not invest caused any of them a concrete injury."); *Lange v. Infinity Healthcare Physicians, S.C.*, 2021 WL 3022117, at *3-4 (W.D. Wis. July 16, 2021); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *5-6 (S.D.N.Y. Oct. 7, 2019); *Wilcox*, 2019 WL 132281, at *10.

### 1.    Plaintiffs' ICI comparisons fail as a matter of law.

Plaintiffs first allege that four actively managed funds offered by the Plan were more expensive than the "median" fund in the same "investment style," according to a report prepared by the Investment Company Institute ("ICI"). Compl. ¶¶ 65-66.[17] Plaintiffs conclude that this makes it "unlikely" that the Committee followed a prudent process for "at least" these funds. *Id*. ¶ 67.

This reasoning is frivolous. It is settled law that "the existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice." *Meiners*, 898 F.3d at 823-24; *see also Tobias*, 2021 WL 4148706, at *14 ("failure to select funds with the lowest cost is insufficient to state a claim for breach of the duty of prudence"). As one of the sources Plaintiffs cite in their own complaint observes, when selecting plan services or investments, "cheaper" is not "necessarily better," and fees "are only one part of the bigger picture."[18] "Nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." *Hecker*, 556 F.3d at 586.

That is especially true here because the ICI Report, which Plaintiffs cite in the hopes of suggesting imprudence, directly undermines Plaintiffs' allegations. Indeed, courts have repeatedly rejected attempts to use the ICI Report as evidence of imprudence in ERISA cases. In *Matney*, for instance, the court held that "expense ratios from the ICI Study do not allow a meaningful analysis." 2022 WL 1186532, at *6. And in *Perkins*, the court explained that "several courts have rejected the Brightscope/ICI study median as a meaningful benchmark." 2022 WL 824839, at *6 (collecting cases). Once again, Plaintiffs simply assert the same flawed allegations.

---

[17]    Ex. 15, *BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* (2017) ("ICI Report"), *available at* https://www.ici.org/doc-server/pdf%3A20_ppr_dcplan_profile_401k.pdf.

[18]    U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 3 (Aug. 2013), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf    (cited    at Compl. ¶ 5 n.3).

The ICI Report provides high-level average expense ratios for "domestic" and "international" equity funds generally. But each of these broad categories encompasses multiple subcategories of funds, such as passively and actively managed funds, small and large cap funds, growth and value funds, or some blend of the above. As the ICI Report explains, the fees for these subcategories of funds vary. For example, actively managed funds are usually more expensive than passively managed funds, even though both may be considered "domestic equity" funds. Ex. 15, ICI Report, at 64.

Because the ICI Report's figures reflect broad categories that aggregate many different types of funds, the document expressly warns that its general statistics should not be used to make crude price-tag comparisons like the ones Plaintiffs offer here:

> ***The fund investment categories used in this report are broad and encompass diverse investment styles within the investment types*** (*e.g.*, active and index); a range of general investment types (such as domestic equity funds, which aggregates growth, sector, alternative strategies, value, and blend); and a variety of arrangements for shareholder services, recordkeeping, or distribution charges (known as 12b-1 fees). This material is intended to provide general information on fees paid by participants in a wide variety of plans to provide insight into average fees across the marketplace. The fees of a particular plan will depend on factors specific to the plan, such as the exact investment options the plan offers and whether administrative and recordkeeping fees are included in the expense ratios or charged outside of them. Consequently, ***this material is not intended for benchmarking the costs of specific plans to the broad averages presented here.***

Ex. 15, ICI Report, at 60 (emphasis added).

One of the funds Plaintiffs challenge as too expensive—the T. Rowe Price Small-Cap Stock Fund—provides a concrete illustration. As the ICI Report recognizes, small-cap funds "tend to be more expensive to manage" than "large-cap or developed market stocks," "which tend to be less expensive to manage." Ex. 15, ICI Report, at 64. Additionally, the T. Rowe Price Small-Cap Stock Fund is actively managed. Compl. ¶ 93. As the ICI Report states, "actively managed mutual funds can offer investors the chance to earn superior returns, access specialized sectors, or take

advantage of alternative investment strategies, all of which can make a fund more expensive to manage" than a passive fund. Ex. 15, ICI Report, at 64. Observing that the T. Rowe Price Small-Cap Stock Fund is more expensive than the median "domestic equity" fund is thus like observing that a sit-down restaurant meal may cost more than the "average" meal. Some participants may prefer an actively managed small cap fund, while others may prefer a simple market index. A prudent fiduciary "can offer them that choice." *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 487 (8th Cir. 2020).[19]

### 2.   Plaintiffs' performance comparisons fail as a matter of law.

In addition to their flawed comparisons to the ICI Report, Plaintiffs claim that three funds in the Plan did not perform favorably. Specifically, Plaintiffs allege that, as of 2021, there were cheaper and better performing alternatives to (1) the T. Rowe Price Institutional Small-Cap Stock Fund, (2) the Harbor Diversified International All Cap Institutional Fund, Compl. ¶¶ 96-97, and (3) the Templeton Global Bond Fund R6, the latter of which is alleged to have performed in the bottom decile over an unspecified one-, three-, and five-year period. *Id*. ¶ 99. Based on these hindsight criticisms, Plaintiffs conclude that a prudent fiduciary "should have been aware" of "better preforming [sic] lower cost alternatives" and "switched to them at the beginning of the Class Period." *Id*. ¶ 103.[20]

---

[19]     Plaintiffs do not mention that the Plans offered several passively-managed domestic and international equity funds (*e.g.*, the Vanguard Extended Market Index Fund and the Vanguard Institutional Index Fund) and a passive international equity fund (the Vanguard Total International Stock Index Admiral Fund) with much lower expenses than the ICI's alleged median expense ratios for the "domestic equity" and "international equity" investment styles. *See* Ex. 4, 404a-5 Disclosure (2018), at 6 (8 bps, 4 bps, and 11 bps, respectively); Compl. ¶ 66.

[20]     In fact, the Harbor Diversified International All Cap Institutional Fund and the Templeton Global Bond Fund R6 were not offered at the start of the putative class period. *See* Ex. 3, 404a-5 Disclosure (2017 Addendum), at 2 (stating that these investments were added to the plan effective November 22, 2017).

These cherry-picked comparisons do not support an inference that the Committee's process for managing the Plans was imprudent. It is irrelevant and immaterial to determine what funds have performed the best *after* the fact. Prudence "cannot be measured in hindsight." *Barchock*, 886 F.3d at 45; *see also St. Vincent*, 712 F.3d at 716 ("[W]e judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight."). Plaintiffs do not plead any facts that show that a prudent fiduciary would have concluded at the start of the putative class period that the T. Rowe Price Institutional Small-Cap Stock Fund, Harbor Diversified International All Cap Institutional Fund, or Templeton Global Bond Fund R6 would underperform in the future.

In addition, Plaintiffs do not allege any facts about the "alternative" investments that show that they are meaningfully comparable. To the contrary, a glance at the funds shows that they are very different. As one example, the Harbor Diversified International All Cap Institutional Fund seeks to invest a majority of its total assets (at least 65%) in foreign stock. Ex. 16, Harbor Prospectus, at 24. By contrast, the American Funds Growth & Income Portfolio R6, the purported "alternative" fund in the complaint, does not target a specific percentage of foreign stock assets, Ex. 17, American Prospectus, at 13-14, and the provider's website indicates that the fund has only a small minority (21%) invested in non-U.S. equities as of April 30, 2022. *See* Capital Group, *American Funds Growth and Income Portfolio SM (RGNGX)*, https://www.capitalgroup.com/individual/investments/fund/rgngx (last visited May 31, 2022).[21] A plaintiff does not allege a "meaningful benchmark" simply "by alleging that cheaper alternative investments with *some* similarities exist

---

[21]     Courts can take judicial notice of prospectuses and similar documents on a motion to dismiss. *E.g.*, *Ferguson*, 2019 WL 4466714, at *3 n.4. It is notable that Plaintiffs appear to misidentify the benchmark for the Harbor Diversified International All Cap Institutional Fund. Plaintiffs assert that the benchmark is the iShares MSCI EAFE ETF. *See* Compl. ¶ 97. The iShares fund is not mentioned in the Harbor fund's prospectus; instead, the benchmark index is the MSCI All Country World Ex. U.S. (ND). *See* Ex. 16, Harbor Prospectus, at 26.

in the marketplace." *Meiners*, 898 F.3d at 823. "Comparing apples and oranges is not a way to show" that one investment "is better or worse than the other." *Davis*, 960 F.3d at 485.

A final problem with Plaintiffs' performance allegations is that, even pleading in hindsight, the T. Rowe Price Institutional Small-Cap Stock Fund and Harbor Diversified International All Cap Institutional Fund did not underperform. Plaintiffs allege that both funds beat their three- and five-year benchmarks. Compl. ¶ 97 (alleging that the Harbor fund outperformed by 1.60% and 0.76% and the T. Rowe Price fund outperformed by 0.67% and 0.21% relative to their three- and five-year benchmarks). For good reason, "[n]o authority requires a fiduciary to pick the best per-forming fund." *Meiners*, 898 F.3d at 823.

The allegation that the Templeton Global Bond R6 Fund underperformed its peers over a three- and five-year period is likewise insufficient. Compl. ¶ 99. As courts have held, "three to five years" is "considered [a] relatively short period[] of underperformance" that does not imply im-prudence. *Dorman v. Charles Schwab Corp.*, 2019 WL 580785, at *6 (N.D. Cal. Feb. 8, 2019); *see also Wehner*, 2021 WL 507599, at *9 ("There is nothing presumptively imprudent about a retirement plan retaining investments 'through periods of underperformance as part of a long-range investment strategy.'"). That is particularly true in light of the Plans' history during the putative class period, which "suggest[s] that Defendants *did* have a prudent process" for monitoring and making decisions regarding the Plans' investments. *Martin v. Career Builder, LLC*, 2020 WL 3578022, at *6 (N.D. Ill. July 1, 2020).[22]

---

[22]     As explained above, the Committee reduced expenses and made significant changes to the Plans' investment menu in late 2017. *See supra* p. 5; *see generally* Ex. 1 through Ex. 6 (404a-5 disclosures). Like the court in *Martin*, many courts have recognized that when fiduciaries make changes to a plan well before a lawsuit is filed, it is not reasonable to infer that a fiduciary was imprudent simply because a plaintiff later purports to identify cheaper or better performing comparators. *See, e.g.*, *White*, 2016 WL 4502808, at *11; *Patterson*, 2019 WL 4934834, at *14 ("the fact that Defendants ultimately removed the 2025 Trust . . . supports an inference that Defendants acted within the bounds of their duties to the Plan").

**III.    Plaintiffs Do Not Plead A Plausible Failure To Monitor Appointed Fiduciaries.**

Plaintiffs' second claim alleges that Dartmouth-Hitchcock and the Board failed to monitor the Committee, and are therefore liable for the Committee's supposed breaches. Compl. ¶¶ 113-16. This fails to state a claim for three reasons.

**A.    Plaintiffs' monitoring claim is derivative.**

A duty to monitor claim is a derivative claim, meaning that a fiduciary does "not fail in the discharge of its duty to select and monitor" if the underlying fiduciary "did not commit a breach." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 292 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009). Plaintiffs plead no underlying breach by the Committee, *see supra* Part I & Part II, so the monitoring claim fails as a matter of course.

**B.    Plaintiffs plead no facts about the monitoring process.**

The monitoring claim independently fails because Plaintiffs allege no facts about the process that Dartmouth-Hitchcock or the Board followed to monitor the Committee and its activities. ERISA recognizes that fiduciaries have a limited duty to monitor appointees at "reasonable intervals" and "in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards." 29 C.F.R. § 2509.75–8 at FR-17. To plead a breach, however, a plaintiff must allege a "specific factual basis to support [a] conclusory allegation of a lack of legally sufficient monitoring by Defendants." *In re Nokia ERISA Litig.*, 2011 WL 7310321, at *5 (S.D.N.Y. Sept. 6, 2011). All that Plaintiffs offer here are conclusory allegations that Dartmouth-Hitchcock and the Board failed to monitor or remove Committee members. Compl. ¶ 116. As many cases recognize, that is insufficient.[23]

---

[23]    *See, e.g.*, *Struve v. Electrolux Home Prods., Inc.*, 2019 WL 918503, at *4 (N.D. Ill. Feb. 25, 2019) ("Plaintiff's conclusory allegations that Defendants failed adequately to monitor Prudential are insufficient."); *Carter v. San Pasqual Fiduciary Tr. Co.*, 2016 WL 6803768, at *5 (C.D. Cal. Apr. 18, 2016)

**C.**      **The monitoring claim against the Board is duplicative.**

Finally, even if Plaintiffs had pled facts suggesting an underlying breach and failure to monitor—and they have not—the Court should dismiss the monitoring claim against the Board. As recognized in another case by Plaintiffs' counsel, a "separate claim" is "duplicative" because Plaintiffs have named Dartmouth-Hitchcock directly. *Perkins*, 2022 WL 824839, at *7.

## CONCLUSION

Plaintiffs ignore their obligation to plead relevant facts in context and offer only generic and speculative allegations that courts have repeatedly rejected. Because the complaint does not make it plausible that the Plans' fiduciaries failed to make prudent decisions, the Court should grant the motion to dismiss.

---

("Plaintiffs allege no facts regarding whether, when, and to what extent Defendants monitored either the San Pasqual Fiduciary Trust or other Defendants.").

Dated: May 31, 2022

Respectfully submitted,

DARTMOUTH-HITCHCOCK CLINIC,
THE BOARD OF TRUSTEES OF
DARTMOUTH-HITCHCOCK CLINIC, AND
THE ADMINISTRATIVE INVESTMENT
OVERSIGHT COMMITTEE OF DARTMOUTH-
HITCHCOCK CLINIC,

By their attorneys,

By: */s/ Nancy G. Ross*
Nancy G. Ross (admitted *pro hac vice*)
Jed W. Glickstein (admitted *pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
nross@mayerbrown.com
jglickstein@mayerbrown.com

E. Brantley Webb (admitted *pro hac vice*)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
bwebb@mayerbrown.com

By: */s/ Kathleen M. Mahan*
Daniel M. Deschenes, Esq. (NH #14889)
Kathleen M. Mahan, Esq. (NH #17124)
HINCKLEY, ALLEN & SNYDER, LLP
650 Elm Street
Manchester, NH  03101
(603) 225-4334
ddeschenes@hinckleyallen.com
kmahan@hinckleyallen.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing(s) to all those registered with the ECF system.

*/s/ Kathleen M. Mahan*
Kathleen M. Mahan, Esq.

-25-